JOHN McKOWN ET UX v. L. D. STROUD

5-5558                                    470 S.W. 2d 929

Opinion delivered October 4, 1971

*Felver A. Rowell, Jr.,* for appellants.

*Gordon, Gordon & Eddy,* for appellee.

J. FRED JONES, Justice. This appeal is from a decree of the Conway County Chancery Court concerning public rights to an easement by prescription over Lot 2, and particularly over the west half of Lot 2, in Block 5 of Moose Addition to the town of Morrilton. Lots 1 and 2 lie beside each other with the east end of each lot fronting 50 feet on East Street. They extend from East Street west 151.25 feet to an alley. Lot 1 lies south of Lot 2 and Lot 1 is bounded on its south side by North Street.

Robert Lane is the owner of the west half of Lot 2 and the west 79.1 feet of Lot 1. Mrs. R. H. Dickenhorst is the owner of the east half of Lot 2 and the east 72.15 feet of Lot 1. Lane owns a brick building on the southwest corner of Lot 1. It fronts 55.5 feet on North Street and extends north along the alley a distance of approximately 50 feet to the north line of Lot 1. Lane originally owned a cafe building on his east 23.6 feet of Lot 1 but it has been torn down to provide a private driveway from North Street across the east end of Lane's portion of Lot 1 to his west half of Lot 2.

Mrs. Dickenhorst owns a brick building which extends across the entire length of her east 72.15 feet of Lot 1. Her building also fronts on North Street and extends north approximately 45 feet. All of Lot 2 lying north of Lot 1, and behind the buildings on Lot 1, is vacant except for a small taxi stand owned by Mrs. Dickenhorst in the northeast corner of Lot 2.

Lane leased his building to the appellee, L. D. Stroud, with right to use the vacant area north and east of the building for customer parking and for ingress and egress from North Street and the alley on the west. Mrs. Dickenhorst leased her building to the appellants, John and Christine McKown. Mrs. McKown owns and operates a tavern where beer is sold and consumed in her leased building and Stroud owns and operates a liquor store where beer is also sold in his leased building.

Mr. Stroud decided to install a "drive-in window" on the east side of his building, thus enabling customers to drive in from North Street over the 23.6 foot area between his building and the McKown Tavern; make their purchases at the drive-in window, then drive around his building over the west half of Lot 2 and exit from the premises *via* the alley west of his building. In preparing the premises for this use and purpose, Mr. Stroud, with Mr. Lane's approval, erected a fence from the northeast corner of the west half of Lot 2 along the east boundary line of the west half of Lot 2, to a point adjacent to the northwest corner of the McKown Tavern building, thus

preventing vehicular traffic from passing from the rear of the tavern building to the rear of the liquor store and vice versa.

The McKowns objected to the erection of the fence and Mr. Stroud objected to McKowns' customers parking in the area behind and adjacent to his liquor store. The objections finally grew into charges and countercharges of tacks and broken glass in driveways, destruction of fences and damage to business, and resulted in a petition in chancery filed by Stroud for an injunction against Mr. McKown restraining him from trespassing on his leased premises and from interfering with the fence erected by Stroud. Mr. McKown denied in his answer that he owned the tavern or that he interfered with the fence or its erection, but Mrs. McKown filed a separate petition contending that the general public had acquired an easement over the entire length of Lot 2 by prescription and she prayed an order requiring Stroud to remove the fence he had erected across the property subject to such easement. Each of the parties claimed damages against the other.

The cases were consolidated for trial and from the evidence submitted at the trial the chancellor found that the sporadic use by the general public of the lands in the rear of the buildings involved was not sufficient to enable either the McKowns or the public generally to acquire an easement for either parking or passage. The chancellor entered a decree enjoining the McKowns from interfering with the fence erected by Stroud and from trespassing thereon. Damages were denied to both parties and the costs were assessed equally against Stroud and the McKowns. Mr. and Mrs. McKown have appealed to this court and they rely upon the following point for reversal:

"That the findings of the trial court are against the preponderance of the evidence when it found that there had only been sporadic use of the premises to the rear of the buildings which had not ripened into a public way by prescription."

We are of the opinion that the chancellor's findings were not against the preponderance of the evidence.

In establishing easements over unenclosed private lands by prescription, the actual use, sporadic or otherwise, is not as important as is the claim of right under which the use is made or exercised. *Duty v. Vinson,* 228 Ark. 617, 309 S. W. 2d 318.

There had never been an alley or passageway platted or dedicated to the public over the land involved in the case at bar. As a matter of fact there is no evidence of a well-defined right-of-way claimed in this case and the entire east and west halves of Lot 2 are involved. Stroud testified that he has designated private parking areas on Lot 2 at the rear of his liquor store for the use of employees and customers, leaving room for his customers to drive between the rear of his store building and the parking area. He testified that on many occasions the McKown Tavern customers would park their automobiles in this area for long periods of time blocking the rear doors to his building and the passageway around his building.

There was considerable evidence to the effect that the area involved behind the buildings leased by the respective parties in this case had been used by the general public for parking wagons and automobiles for many years, and that on many occasions people driving to the rear of the buildings on Lot 1 would drive through the length of Lot 2. There is also considerable evidence to the effect that the area involved behind the buildings leased by the parties in this case was no different in public use from many other vacant lots and areas behind business buildings in the town of Morrilton—simply used by the general public for off-street parking and convenient passage without claim of right adverse to the owners.

The evidence in this case also indicates that there has always been little occasion for the public generally to use Lot 2 except for off-street parking and for going

to and from the rear of the buildings on Lot 1. The evidence is to the effect that at one time there were four different businesses in the building occupied by the Mc-Kowns, and that for the past few years all of the building has been used for their tavern except for a barber shop in the east end of the building.

Mr. Lane testified that at one time there were five different business tenants in his building and that they had private parking areas marked as such on his portion of Lot 2 behind their respective businesses. He testified that in recent years someone knocked the curb off the west side of East Street with a sledge hammer in order to drive into the area; that a part of the area is real rough and that he has never driven, and has never seen others drive, an automobile all the way through the area from East Street to the alley.

Wiley McCoy testified that he operates the taxi stand on the northeast corner of Lot 2. He says that in the 1920's cottonseed was sold on the area involved. Mr. Mc-Coy then testified in part as follows:

"Q. Now to your knowledge, how long has the public generally traveled the passageway immediately behind McKown Tavern, Morrilton Liquor Store and Bishop's Barber Shop?

A. Well they was the Potteets that bought cottonseed back there. And I'd come with my dad, had some cottonseed in the wagon, and he would sell and you would go either way through there. Now how long ago that's been, I don't know.

Q. Since you were a small boy?

A. Yeah.

Q. How long ago has that been?

A. It's been a good while.

Q. All right, did the public to your knowledge generally travel this area?

A. Yes, I've seen them in there with wagons where you couldn't hardly get through unloading seeds."

Mr. McCoy testified that vehicles can still be driven to the rear of the tavern from East Street and he then testified as follows:

"Q. Mr. McCoy, prior to the time this fence was erected, did you ever drive through behind the two buildings in operating your taxi business?

A. Yes, I would haul passengers. And they would get off at the liquor store and get their package and I'd go down through there, but I never did drive but a few times because if you've got kind of a long car, if you don't hit it slanted, why it'll drag on me.

Q. But you have used it?

A. Yeah, I have drove through there."

Mrs. McKown testified that before the fence was erected her customers could drive all the way through the property involved and that now they cannot. In explaining her loss in business she testified as follows:

"Q. Would you explain that to the court?

A. Well because they can't drive through there. They just don't come to the back door any more. People that didn't want the general public to see them come to the back door and order their beer and put it in their car and drive on through. But now they can't.

Q. Why can't they?

A. Because of the fence.

Q. All right, can they turn around?

A. Finally, yes, sir.

Q. Is it inconvenient for them?

A. Very much so."

On cross-examination Mrs. McKown testified that she had operated her tavern a little over two years; and that she had never claimed any parking rights behind Mr. Stroud's liquor store. She then testified as follows:

"Q. Did you have any parking space on it that was let to you or did you have a right to park on it?

A. Nothing except just this alley thing what everybody called an alley behind my building. Not behind Mr. Stroud's building.

Q. You never contended you had any right to pull up there and park?

A. No.

Q. Did Mr. Stroud use it for loading and unloading purposes?

A. Why I think so.

Q. And you used the area behind your store for loading and unloading?

A. Well I don't believe so. I don't know why he should. His trucks came through that way if that's what you are talking about.

Q. You used this space behind your store for loading and unloading also?

A. No.

Q. You did not. How did the trucks unload at your place? How did the beer trucks unload? Where did they park?

A. In the front because there isn't any room in the back. They can't drive through.

Q. Have they ever pulled to the back and unloaded?

A. Not that I can remember.

Q. Even before the fence was erected?

A. I don't think so.

Q. All right.

A. The garbage truck does."

From the overall testimony in this case it appears that at one time there were nine separate stores and businesses located on Lot 1 fronting on North Street, and that the general public drove wagons over Lot 2 in loading their purchases from the rear doors of the various businesses on Lot 1 and for parking their wagons and hitching their teams off the streets while shopping in town. The testimony further indicates that there has never been any reason for the general public to travel over the area involved except for off-street parking and in patronizing the businesses located on Lot 1. The testimony further indicates that the liquor store and tavern are the only businesses left on Lot 1 with doors opening to the rear and that in recent years there has been little occasion for the general public to use the area involved except for off-street parking.

The chancellor relied heavily on our decision in *Duty* v. *Vinson, supra,* and in doing so we are of the opinion that the chancellor was correct. In *Duty* v. *Vinson* we said:

"While the owner of one lot may acquire an easement over the unenclosed land of another by open, continuous and adverse use thereof under a claim of right for a period of seven years, a mere user does not ripen into a prescriptive right unless the circumstances are such as to put the owner of the servient estate on notice that the way is being used adversely under a claim of right. *Bond* v. *Stanton,* 182 Ark. 289, 31 S. W. 2d 409; *Barbee* v. *Carpenter,* 223 Ark. 660, 267 S. W. 2d 768. The burden was upon appellees to show by a preponderance of the evidence that the use of their tenants and the public generally of the disputed strip was adverse to appellants and their predecessors in title and not under their permission."

We find no evidence in the record that the use made of the property by the general public in recent years, or even in the horse and wagon days, was anything other than permissive.

We have not overlooked *Rochelle* v. *Piles,* 244 Ark. 606, 427 S. W. 2d 10, cited by the appellant, which involved the only means of ingress and egress for many years over a part of what had formerly been a clearly defined public way between the properties of the litigants. Neither have we overlooked our decision in *Fullenweider* v. *Kitchens,* 223 Ark. 442, 266 S. W. 2d 281, cited by the appellants, in which case the appellant attempted to close a road running from the appellee's land to a public road and that had been used as the only means of access to the appellee's land for a period of 35 years. In *Fullenweider* the appellant fenced the appellee's property off from access to the public road and refused to designate an alternate route across appellant's land.

We do not agree with the appellants that the facts in the case at bar are similar to the facts of *Barbee* v. *Carpenter,* 223 Ark. 660, 267 S. W. 2d 768, cited by the appellants. In the first place the easement considered in *Barbee* was over a part of a dedicated street which had been abandoned by city council action because a part of

it was inaccessible. The open portion of the street had been deeded to the appellees who were the abutting landowners. The open portion of the street led to the appellants' backyard and was the only means of ingress to the appellants' backyard. There was a hedge along the sidewalk in front of their home and the driveway served not simply as an alternative route of convenience, but constituted the only available path to the appellants' back door. By a correction deed from the city in 1940 the appellee simply undertook to convert into private property what had been a public street since 1881.

We are of the opinion that the chancellor's decision is not against the preponderance of the evidence in this case, and that the decree should be affirmed.

Decree affirmed.